BLACKLEDGE v. WEIR & CRAIG MFG. CO.

(Circuit Court of Appeals, Seventh Circuit. April 9, 1901.)

No. 746.

PATENTS—RIGHTS AND LIABILITIES OF JOINT OWNERS—RIGHT TO ACCOUNTING FOR PROFITS.

A patent confers on the patentee only the right to exclude others from using the invention for which it is granted, and where it is owned by two or more persons the effect is merely to except each part owner from such exclusion, leaving him free to use the invention in any way he may choose for his own interest, independently of his co-owners, but subject to their equal rights. He cannot be held accountable to a co-owner for any part of the profits he may make from the manufacture and sale or use of the patented article, nor from licenses granted by him to others, since such licenses cannot convey any exclusive right, or any interest which belongs to the co-owner, but amount only to a sale by him of the whole or a part of his own interest.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The plaintiff in error, who is the guardian of Moses Crawford, insane, brought this action in right of his ward as the equal co-owner with the defendant, the Weir & Craig Manufacturing Company, of letters patent of the United States No. 373,353, granted on January 31, 1888, to James A. Cunning and Frank P. Woolen, for a device used for scraping hogs. Cunning, on March 30, 1888, assigned his title and interest to the plaintiff for the use of his ward, and by mesne assignments the title and interest of Woolen passed to William H. Silberhorn, who, on the 17th day of August, 1889, joined the plaintiff in executing to the defendant a written grant of the right to manufacture and sell the patented device in the United States for the period of five years from that date, in consideration whereof the defendant agreed to pay a royalty of $600 on each machine manufactured by it, $300 to the plaintiff and $300 to Silberhorn. On August 11, 1890, Silberhorn assigned his interest in the letters patent to the defendant, and since that time the plaintiff and the defendant have been equal co-owners of the patent. Upon the expiration of the contract on August 17, 1894, the defendant, though it has since manufactured, sold, and used the patented machine as before, ceased to pay the plaintiff the stipulated royalty or any share of the profits realized.

The declaration is in assumpsit, and, after reciting the facts stated, charges that the defendant, from the 11th day of August, 1890, has by itself, at Chicago and elsewhere throughout the United States, exercised the exclusive rights of both owners "by granting licenses, shop rights, and other rights under said letters patent," and from August 17, 1894, to the commencement of the action had by itself exercised and enjoyed the monopoly of the patent by manufacturing, selling, leasing, and using the patented device, and has received therefor, and by reason of the monopoly, large sums, amounting to $10,000, one-half of which belongs to the plaintiff, etc. To this declaration the defendant interposed a general demurrer, which the court sustained (105 Fed. 1006), and, the plaintiff declining to amend, judgment was given for the defendant. Error is assigned upon the ruling on the demurrer.

Reference has been made in the briefs of both parties to the following cases: In re Russell's Patent, 2 De Gex & J. 130; Hancock v. Bewley, Johns. 601; Mathers v. Green, 34 Beav. 170; s. c. on appeal, 35 Law J. Ch. 1; In re Horsley & Knighton's Patent, 39 Law J. Ch. 157; Steers v. Rogers, 62 Law J. Ch. 671; Sheehan v. Railway Co., 16 Ch. Div. 59; Dent v. Turpin, 2 Johns. & H. 139; Powell v. Head, 12 Ch. Div. 686 (copyright); Parkhurst v. Kinsman, 6 N. J. Eq. 601; Vose v. Singer, 4 Allen, 226; Freeman v. Freeman, 142 Mass. 98, 7 N. E. 710; De Witt v. Manufacturing Co., 66 N. Y. 460; Fraser v. Gates, 118 Ill. 99, 1 N. E. 817; Washburn & Moen Mfg. Co. v. Chicago Galvanized Wire Fence Co., 109 Ill. 71; Gates v. Fraser, 9 Ill. App. 624; Marsh v. Machine Co. (N. J. Sup.) 29 Atl. 481; Carter v. Bailey, 64 Me. 458 (copyright); Gould v. Banks, 8 Wend. 568 (copyright); Dunham v. Railroad Co., Fed. Cas. No. 4,151; Curran v. Burdsall (D. C.) 20 Fed. 835; Manufacturing Co. v. Gill (C. C.) 32 Fed. 697, 702; Pusey & Jones Co. v. Miller (C. C.) 61 Fed. 401; Pitts v. Hall, Fed. Cas. No. 11,193; Clum v. Brewer, 2 Curt. 506, Fed. Cas. No. 2,909; Herring v. Association (C. C.) 9 Fed. 556; Lalance & Grosjean Mfg. Co. v. Haberman Mfg. Co. (C. C.) 93 Fed. 197; Jewett v. Suspender Co. (C. C.) 100 Fed. 647; Bloomer v. McQuewan, 14 How. 539, 14 L. Ed. 532; Curt. Pat. §§ 188-192; Walk. Pat. (3d Ed.) § 294; Rob. Pat. § 795 et seq.

V. H. Lockwood, for plaintiff in error.

Charles E. Pickard, for defendant in error.

Before WOODS and JENKINS, Circuit Judges.

WOODS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

Most of the cases cited contain nothing but dicta on the subject, and in many instances dicta of more than the usual irrelevancy to the cases in which they were uttered.

In Clum v. Brewer, 2 Curt. 506, Fed. Cas. No. 2,909, Justice Curtis ruled that:

"One tenant in common has as good a right to use, and to license third persons to use, the thing patented, as the other tenant in common has. Neither can * * * assert a superior equity, unless it has been created by some contract modifying the rights which belong to them as tenants in common."

Whatever be the bearing of the principle stated, this expression does not in terms cover the question of the liability of one part owner to another to account for profits derived from the use of the invention.

In Manufacturing Co. v. Gill Justice Bradley said:

"If one joint owner derives a profit from the patent, either by using the invention, or getting royalties for its use, or purchase money for sale of rights, it would seem that he should be accountable to the other part owners for their portion of such profit; and probably a bill for an account should be sustained therefor."

He immediately added:

"But this is a matter of mere speculation, so far as this case is concerned. It is clear, I think, that one part owner cannot maintain suit against another for infringement."

In the cases decided by them, Judges Drummond, Blodgett, Treat, Wales, and Lacombe have each in more or less direct terms expressed the opinion or supposition that there might be a right to an accounting for profits between co-owners of an invention, and in two or three cases it has been said that one part owner might have an action against the other owner for infringement,—a proposition which seems to us wholly untenable. "The franchise which the patent grants," said the supreme court in Bloomer v. McQuewan, 14 How. 539, 14 L. Ed. 532, "consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee"; and while the statute regulating the subject authorizes the issue of a patent to two or more, and the transfer by assignment of partial interests to different persons, it contains no expression or intimation that one owner may not use the invention without the consent of the co-owner. To ingraft such a meaning upon the statute by construction would be promotive of injustice, because it would put the enterprising owner at the mercy of the drone, visionary, or knave with whom he should find himself associated.

The English cases are explicit. In Mathers v. Green the master of the rolls held a part owner of a patent accountable to another part owner for a share of the profits made by the use of the invention, but on appeal the judgment was reversed; the lord chancellor (Cranworth) in the course of his opinion saying:

"The right conferred is a right to exclude all the world other than the grantees from using the invention. But there is no exclusion in the letters patent of any one of the patentees. The inability of any one of the patentees to use the invention, if such inability exists, must be sought elsewhere than in the letters patent. But there is no principle, in the absence of contract, which can prevent any persons not prohibited by statute from using any invention whatever. Is there, then, any implied contract, where two or more persons jointly obtain letters patent, that no one of them shall use the invention without the consent of the others, or, if he does, that he shall use it for their joint benefit? I can discover no principle for such a doctrine. It would enable one of two patentees either to prevent the use of the invention altogether, or else compel the other patentee to risk his skill and capital in the use of the invention on the terms of his being accountable for half the profit, if profit should be made, without being able to call on his co-patentees for contribution if there should be a loss. This would be to place the parties in a relation to each other which, I think, no court can assume to have been intended, in the absence of express contract to that effect."

And to the same effect in Steers v. Rogers the lord chancellor (Herschel) said:

"What is the right which a patentee has, or patentees have? It has been spoken of as though a patent right were a chattel or analogous to a chattel. The truth is that letters patent do not give the patentee any right to use the invention. They do not confer upon him a right to manufacture according to his invention. That is a right which he would have equally effectually if there were no letters patent at all, only in that case the world would equally have the right. What the letters patent confer is the right to exclude others

from manufacturing in a particular way and using a particular invention. When that is borne in mind it appears to me very clear that it would be impossible to hold under these circumstances that, where there are several patentees, either of them, if he uses the patent, can be called upon by the others to pay them a portion of the profits which he makes by that manufacture, because they are all of them, or perhaps any of them is, entitled to prevent the rest of the world from using it."

An instructive discussion of the subject may be found in Vose v. Singer, 4 Allen, 226. The parties to that suit were the half owners, respectively, of "the sole and exclusive right to use and to vend to others to be used (but not to build or make)" the patented machine within specified territory; and, in considering whether the defendants should account to the plaintiffs for a moiety of profits made from the sales of the patented article, the court rejected as unsatisfactory the analogies supposed to be found in the joint ownership of real estate and the various species of personal property, and, in expression of the principles involved, said:

"A patent right is a chattel interest. Therefore a tenancy in common or part ownership in it is much like a tenancy in common or part ownership of other personal property. But the use of a patent right is different from the use of any other property, and therefore it is not safe to follow the rules adopted in regard to the mutual liabilities of part owners of ships, horses, grain, liquor, etc. It would not be safe to conclude that, because the owner in common of a horse is not liable, though he retains the exclusive use of him, therefore the part owner of the patent who uses it exclusively is not liable; nor because the tenant in common of the grain or liquor, who uses it exclusively and consumes it in using, is liable, therefore the part owner of a patent is liable. There is a possibility that the part owner of the patent may so supply the market as to appropriate to himself the whole value of the patent; and, on the other hand, his use of it may have the effect to create a market so extensive as greatly to enhance the value of the whole patent. On the whole, then, we are compelled to reject all arguments from analogy, and look at the question upon its own apparent merits. * * * There is nothing to restrict the party owning each moiety of the right from selling and assigning that moiety, or any fractional part of it, or as many fractional parts as he pleases. Each may purchase as many machines as he pleases; and, having purchased them, he may sell them to others, with the right to use and sell them; or may refuse to sell them, and may rent them, or establish manufactories, either alone or in company with others, in which the machines shall be used; or either party may neglect or refuse to purchase, use, or sell any machines or any rights, or to make his moiety profitable in any way. The right is thus subject to transfers and subdivisions, and may be used in a great variety of ways. None of the parties interested has any right to control the action of the other parties, or to exercise any supervision over them. It is difficult to see how an equitable right of contribution can exist among any of them, unless it includes all the parties interested and extends through the whole term of the patent right; and if there be a claim for contribution of profits, there should also be a correlative claim for losses, and an obligation upon each party to use due diligence in making his interest profitable. It is not and cannot be contended that these parties are co-partners; but the idea of mutual contribution for profits and losses would require even more than co-partnership. Nothing short of the relation of stockholders in a joint-stock company would meet the exigencies of parties whose interests may be thus transferred and subdivided. But even as between the original parties, as there was no mutual obligation to contribute for losses, or to use any diligence to make the property profitable, and as each party was at liberty to buy, use, and sell machines at his pleasure, and to sell his moiety of the right, or fractional parts of it, we think no obligation arose out of the part ownership, as being legally or equitably incident to it, to make contribution of profits. But, in the absence of any contract, we think each party was at liberty to

use his moiety as he might think fit, within the territory described. If the defendants have realized any profit in the manner alleged, it has been by investing capital in the purchase of machines, and the use of skill and labor in selling them; and they have taken the risk of losses. Apparently 'there is no more reason why the plaintiffs should claim a part of the advanced price for which they may have sold their machines than there would have been for claiming a part of the price if they had sold their right itself for an advance. * * * These parties must be regarded as having interests which are distinct and separate in their nature, though they are derived from the same contract; and having such interests, with the right to use them separately, they cannot for any legal use of them incur any obligation to each other."

In the Dunham Case the question was whether one who had contracted with a part owner of a patent for a license to use the invention could rightfully refuse to accept of the contracting owner a license not signed by the other owners. "The material point," it was declared, "is, who is to answer, if any one, to the other patentees for the use of the part which does not belong to them, when a joint owner uses the improvement or makes a contract with another person for its use?" and reasoning from that point of view, in accord with the quotation from Justice Curtis in Clum v. Brewer, Judge Drummond said:

"One of them has no superiority of right over the other. One of them can use and manufacture the article patented without the consent of the others; that is, each has the same right, although one may own a greater share of the thing patented than the other. The grant was, in this case, to the three to make, use, and vend the improved car-brake shoes; and while it is clear that one of the patentees cannot grant what does not belong to him, and, if he gives a license or makes a contract for the use of the thing patented, he can only grant that which he has himself, and not the rights of the other patentees, still he can clothe his grantee or licensee with the same right that he has himself, namely, the right to sell or use the thing patented. And it seems to me the better rule is to hold, if there is a liability at all, that, where a party owning less than the whole of a thing patented makes a grant or license, he shall be answerable to the others, rather than that the other patentees shall look to the grantee or licensee."

—and, after quoting the passage cited above from Chancellor Cranworth, added:

"Now, while this is the principle announced by the chancellor, it perhaps should be with this qualification: that, if one of the patentees obtains more than his share of the profits, he might be held liable under certain circumstances to the others. Certainly I do not wish to be understood as affirming that there is never such liability. Of course, we must take into consideration any risk which he may run, and any outlay of money which he may make in the manufacture or sale of the article; but if, looking at it upon equitable principles, he has obtained more than his share of the profits arising from the thing patented, either in the use or sale of it or of licenses, it seems to me he might in certain cases be held accountable to the other joint patentees. But it is not necessary in this case to decide that point. My conclusion therefore is that the fact that one of the patentees has given a license to the defendant to use the thing patented clothes him with the right to use it, and, having that right, he is liable under his contract for the payment of the one thousand dollars which he agreed to pay for the license."

The contract in that case as it is briefly stated—"a contract with the defendant," one of the three joint patentees, "for a license to use the invention"—called for a license from the defendant only, and the refusal to accept the license tendered was a breach of the contract

for which the plaintiff had a cause of action, regardless of the question who, if anybody, should answer to the other patentees for the use of the invention by the licensee. Knowing the law, the parties to the contract knew that the stipulated grant could confer upon the licensee only the right of the licensor,—that is to say, the right to make, use, and vend the patented article,—but not an exclusive right, because the other patentees might confer upon rival manufacturers or dealers equal privileges under the patent. This being so, it is to be presumed that the price agreed to be paid for the individual license, which left the other patentees free to use and to license others to use the invention, was less than would have been paid for a license from all of the patentees.

The use of an invention by one of co-owners or by his licensees is not the exercise of the entire monopoly conferred by the patent. That can be effected only by the joint or concurrent action of all owners. The separate action of any one owner or of his licensees can be an exercise or use only of his individual right, which, though exclusive of all besides, is not exclusive of the other patentees, their assignees or licensees. On principle, therefore, there can be no accountability on the part of a part owner of an invention to other owners for profits made by the exercise of his individual right, whether it be by engaging in the manufacture and sale, or by granting to others licenses, or by assigning interests in the patent. His use of the invention in any lawful way is not an appropriation of anything which belongs to another. The separate rights of the other owners remain unaffected. They are equally free to use the invention in all legitimate ways for their individual profit. Each is entitled to the fruits of his endeavors, taking no risk and expecting no reward from enterprises in which he does not choose to join. There is, therefore, no ground for the distinction insisted upon between profits derived directly from the manufacture, use, and sale of the patented article by the owner and profits derived by him from the sale of licenses. It is conceded that the part owner of an invention may sell his title or interest as a whole or in parts without being accountable to another owner for any portion of the consideration received. But it is clear that he might part with his entire title or interest by granting a license or licenses in terms which should forbid further licenses and further use by himself of the invention. In such a case the license fee or fees would be the price obtained for his interest in the invention, and so the price of any license by which he parts with a fraction of his interests in terms excluding him and his assigns from a rival use of the invention is the consideration received for the transfer of so much of his right or interest, and not of any right of the other owners of the patent. Besides, if it be conceded that one of co-owners may engage in the manufacture and sale of a patented article without accounting to the other owners for the profits, on what principle shall it be said that he may not grant a license to a corporation or a partnership in which he is interested,—it may be, solely interested? And if to a corporation or a partnership in which he is directly interested, then why not to a corporation or company or person in whom he

is indirectly concerned, say as mortgagee, general creditor, surety, or otherwise? Where shall the line be drawn?

It follows that the charge in the declaration that the defendant "has by itself exercised the exclusive rights granted to both the plaintiff and defendant" is not true. In the nature of things that could not be technically so; and it is not alleged that the defendant has intentionally and wrongfully so exercised its individual right under the patent as to destroy the value of the equal right possessed by the plaintiff.

The judgment of the circuit court is affirmed.