## GORDON *v.* O'NEILL.

ESTOPPEL—PATENTS—SALES.

> Where defendant and plaintiff owned, in common with defendant's wife, a license to manufacture certain patented articles, and plaintiff wrote defendant that he would take $2,500 for his interest, if defendant should be able to dispose of it with the other licensees' rights, plaintiff's interest was distinct and severable from the others, so that he could deal with it as a separate interest, and having permitted the deal to be consummated after notice of the amounts the other licensees were to receive, and that they were to obtain $7,500 for their interests, he was estopped from claiming that he was mistaken as to the proportion of the license belonging to him, and that he should have received half, in an action to recover an additional $2,500 of the purchase price.

Error to Wayne; Codd, J. Submitted October 8, 1912. (Docket No. 3.) Decided April 8, 1913. Rehearing denied July 18, 1913.

Assumpsit by David A. Gordon against Frank O'Neill and Marion O'Neill, for money had and received. Judgment for plaintiff. Defendants bring error. Reversed.

*Keena, Lightner, Oxtoby & Oxtoby (Frederick N. McClellan,* of counsel), for appellants.

*John J. Gafill (Frederic T. Harward,* of counsel), for appellee.

BROOKE, J. The action is assumpsit for the recovery of $2,500 and interest, said to have been paid by plaintiff to defendants by mistake on May 30, 1908.

The relations between the parties are of long standing and complicated. Prior to 1899, plaintiff was engaged in the glass manufacturing business at Wallaceburg, Ont. At that time defendant Frank O'Neill, who was an inventor of glass manufacturing machinery, also resided at Wallaceburg. Prior to that time O'Neill had secured or applied for three patents identified in the record as A, B, and C. On March 15, 1899, the title to these patents was placed one-fourth in Christian Arducer and three-fourths in defendant Marion O'Neill.

On Sept. 30, 1899, plaintiff and defendant entered into the following contract:

"This agreement made this 30th day of September, 1899, between David Gordon, party of the first part, and Frank O'Neill, party of the second part, both of Wallaceburg, Canada, witnesseth, that whereas the party of the second part has invented a certain improvement in machines for manufacturing glassware, wherein the manufactured articles are partly pressed and partly blown, the same being known as a 'combined pressing and blowing machine.' And whereas, said machine contains certain improvements adapted as well for 'pressing machines' (machines wherein the articles are made entirely by pressing) as for 'pressing and blowing machines.' And whereas the party of the first part is desirous of acquiring an interest in said machine and in the letters patent to be obtained therefor. And whereas, the party of the second part is desirous of reserving to himself, within the territory of the United States, the exclusive right to make, use and sell such of said machines or parts thereof as are adapted for 'pressing' alone, in contradistinction to 'pressing and blowing,' it being the desire of the parties hereto that the interest to be conveyed shall relate only to

such machines as are constructed for pressing and blowing:   Now, therefore, the parties have agreed as follows:

"(1) The party of the first part agrees to pay all expenses incident to building one of said machines, including plans and patterns therefor; to pay all expenses incident to testing said machine and demonstrating its operativeness, said machine to be complete and operative; and to pay all expenses incident to procuring letters patent of the United States on said invention.

"(2) The party of the first part agrees to pay all expenses incident to obtaining letters patent in such countries, other than the United States, as the parties hereto may hereafter agree upon.

"(3) The party of the second part agrees, upon the faithful performance by the party of the first part of the covenants of article 1 hereof, to execute and deliver to the party of the first part, and at his cost, an assignment of an undivided one-half interest in the United States letters patent on said improved machine.

"(4) The party of the first part agrees to execute and deliver to the party of the second part, concurrently with the execution and delivery of the assignment referred to in article 3 hereof, an exclusive license to make, use and sell said improved machine as a 'pressing machine' or any part or parts thereof designed for such use, said license to cover the territory of the United States and the Dominion of Canada.

"(5) The party of the second part agrees to convey to the party of the first part, when requested so to do and at the cost of the party of the first part, an undivided one-half interest in any and all letters patent coming within the terms of article 2 hereof.

"(6) The parties mutually agree that any and all patents of which they may become joint owners, or in which they may be jointly interested, shall be operated under for their mutual benefit, with an equal division of any and all profits arising therefrom, whether such profits are derived from individual or from joint exercise of the rights secured by the patents.

"(7) The parties mutually agree that the 'first machine,' being the one referred to in article 1 hereof, shall belong to them jointly, share and share alike.

"(8) The parties mutually agree that all patents of which they may become joint owners, or in which they

may have common interest, shall be maintained at their joint expense.

"In witness whereof, the parties above named have hereunto set their hands the day and year first above written.

[Signed]        "Frank O'Neill.
[Signed]        "D. A. Gordon.

"Witness:

[Signed]        "Thos. Harrison, Jr."

After the execution of this contract, and in the years 1900 and 1901, defendant Frank O'Neill took out three other patents known in the record as D, E, and F. The abstract of title of patents A, B, and C is as follows:

"(1) July 15, 1898, O'Neill transferred to Arducer of Cicero, Ind., one-quarter interest.

"(2) December 22, 1898, Arducer and O'Neill transferred their interests to Safe Glass Company.

"(3) March 15, 1899, the Safe Glass Company transferred one-fourth interest to Arducer and a three-fourths interest to defendant Marion O'Neill.

"(4) January 13, 1902, Arducer transferred his one-fourth interest to plaintiff Gordon.

"(5) October 13, 1902, Marion O'Neill transferred one-half interest in whole patent to plaintiff Gordon; their paper titles then stood one-fourth in Marion O'Neill and three-fourths in Gordon.

"(6) June 25, 1903, Marion O'Neill, Frank O'Neill, and Gordon transferred their rights to Ball Bros., of Muncie, Ind.

"(7) June 25, 1903. On the same day Ball Bros. gave back a license to the O'Neills and Gordon to all of the United States reserving to themselves the State of Indiana.

"(8) May 15, 1908, Ball Bros. bought back, for $10,-000, the licenses they had conveyed to the O'Neills and Gordon."

The material entries from the abstract of title to patents D, E, and F are:

"(1) October 13, 1902, Frank O'Neill transferred one-half interest in said patents to Gordon.

"(2) June 25, 1903, Marion O'Neill, Frank O'Neill, and Gordon transferred license in these patents for State of Indiana to Ball Bros."

On May 15, 1908, when the transaction out of which this controversy arises occurred, the three earlier patents were owned by Ball Bros., with a license outstanding in the plaintiff and defendants, covering all of the United States, except the State of Indiana. The three later patents were owned equally by plaintiff and Frank O'Neill, with a license outstanding to Ball Bros. for the State of Indiana. During the years from 1901 to 1905, plaintiff and defendant Frank O'Neill sold rights under one or other of the various patents, and likewise sold some machines. They divided the receipts equally to the extent of perhaps $50,000. The largest single transaction was that of June 25, 1903, when the three patents, A, B, and C were sold outright to Ball Bros., with a license back to Gordon and the O'Neills, and a license under patents D, E, and F for the State of Indiana was granted to Ball Bros. Ball Bros. paid at this time $12,000.

In the spring of 1908, defendant Frank O'Neill was approached by Ball Bros., who desired to repurchase from the plaintiff and defendants the license which they (Ball Bros.) had conveyed to Gordon and the O'Neills on June 25, 1903.

Very little business, if any, had been transacted between the parties to this suit with reference to the patents for some three or four years prior to this date. They had made no sales and issued no licenses during this period, except, perhaps, one transaction in May, 1906, involving a small amount, and had done no business under the license from Ball Bros. Upon receiving the inquiry from Ball Bros., Frank O'Neill wrote to plaintiff the following letter:

"ZANESVILLE, O., March 31 / 08.
"Mr. D. A. GORDON,
    "Wallaceburg, Ont.
"*Dear Gordon:*
  "Please advise me what you will take for your interest in the license given us by Ball Bros.
  "I do not know that I could accomplish anything by having it, but it occurred to me that perhaps I might do

something with it, so kindly write me what is the least amount you will sell it for.

" I expect to have my new beer bottle machine in working order within the next ten (10) days. Have been able to reduce the cost of building it from $2,500 to $400 and make a much better machine.

" What has become of the case against the Owen people?

" Yours resp.,
[Signed] "FRANK O'NEILL.
"775 Market St., Zanesville, O."

To this letter plaintiff replied as follows:

"WALLACEBURG, ONT., Apr. 6, '08.
"Mr. FRANK O'NEILL,
"775 Market St.,
"Zanesville, Ohio.
"*Dear Mr. O'Neill:*
" I have your favor of the 3d. Regarding your inquiry as to what I will take for my interest in the license given by Ball Bros. I leave this matter entirely in your hand, and will accept whatever sum you may think right. Right off the bat I would be pleased to get $2,500.

" I am glad to learn that you are going to have your beer bottle machine working and would like well to see it.

" The case against the Owens Co. is still in the courts and I am now awaiting a reply from England regarding the success of the Ryland's machine over there.

" I shall be glad to hear from you at your convenience. With kind regards from the writer and Mrs. Gordon to both yourself and Mrs. O'Neill, I am,

" Yours sincerely,
[Signed] "D. A. GORDON.
" D. A. G."

O'Neill next wrote the following letter:

"ZANESVILLE, O., 5—9—08.
"Mr. D. A. GORDON.
"Wallaceburg, Ont.
"*Dear Gordon:*
" Rec'd your letter stating you would be satisfied with $2,500 for your interest in license referred to, so I have given an option for 60 days on said license, option dating from May 1.

" If the deal should go through, I sacrifice a whole lot, as it practically cuts me out from making, at any time, any machine for automatically feeding the glass to a blowing machine.  It would leave me only a hand fed machine for my beer bottles.

" Of course it cuts no figure with you, though, and a bird in the hand may be worth two in the bush to me.   *  *  *

" Yours truly,

[Signed]        " FRANK O'NEILL.

" 775 Market St."

And Gordon replied:

" WALLACEBURG, ONT., May 11, 1908.

" Mr. FRANK O'NEILL,
" Zanesville, O.

" *My dear O'Neill:*

" I have yours of the 9th, and note what you say regarding option, which is all right.

" I am glad to learn that you are making a success of your beer bottle machine, and trust you will be well repaid by your invention.   Will write the parties in question regarding the machine they are working at Glenshaw.

" I am usually home every Sunday, and could arrange to meet you at Pt. Lampton at any time, or if that would be inconvenient I could meet you at Chatham or here during the day on Monday, as I always leave for Ottawa on the train leaving Chatham at 5:18.

" Yours very truly,

[Signed]        " D. A. GORDON.

" Dict. D. A. G."

The option given by Frank O'Neill to Ball Bros. as a result of this correspondence follows:

" ZANESVILLE, O., May 1, '08.

" BALL BROS.
" Muncie, Ind.

" *Gentlemen:*

" I hereby grant you an option for sixty (60) days, on license granted by Ball Bros. to David A. Gordon, Frank O'Neill and Marion O'Neill.   Purchase price of said license to be $10,000 (ten thousand dollars).

" FRANK O'NEILL."

Thereafter Ball Bros., with the assistance of O'Neill,

acquired, at a cost of several thousand dollars, the other
licenses outstanding under patents A, B, and C.   Having
acquired the others, Ball Bros. then indicated their will-
ingness to accept the terms proffered by O'Neill for the
license owned by the three parties to this suit.   An ap-
pointment was made with plaintiff for May 23, 1908, at
Windsor, Ont., to close the deal.   Ball Bros. were repre-
sented by their attorney, Mr. McClellan, and he was ac-
companied by Frank O'Neill.   The parties met upon the
arrival of plaintiff's train and immediately proceeded to
transact the business which had brought them together.

Plaintiff's version of what occurred at this interview is
as follows:

"They met me at the station in Windsor on the arrival
of the train at 2:30.   Mr. O'Neill and Mr. McClellan met
me.   Mr. O'Neill and I at the station discussed the mat-
ter two or three minutes, and then went up to the British
American Hotel and sat down to talk a few minutes; I
did not have time to read the documents through.   There
was some discussion as to the parties, also as to the pat-
ents; that is, the blowing and pressing patents.   We
went from there to Mr. Clark's office to draw the drafts
and sign the documents.   I was told within a short time
the amount that they were going to give, and the propor-
tion coming to the several parties.   I said to Mr. O'Neill
that I did not think that was right, and Mr. O'Neill vol-
unteered first that it was the Arducer patent which I only
had one-fourth interest.   That was why I should get only
$2,500.   I think that was when we were going out of Mr.
Clark's office and walking down to the corner that that
conversation passes between Mr. O'Neill and myself.   I
drew the drafts up at Mr. O'Neill's request, $2,500 to his
wife and $5,000 to himself, and that left $2,500 for my-
self.   I drew them on Ball Bros.   They brought the
blank drafts with them.   The drafts were drawn by my-
self.   There was some conversation as to how the deal
should be put through; I suggested making drafts out
and attaching them to the documents and sending them
through the bank at Windsor, giving the bank instruc-
tions."

Following this interview, and after O'Neill and McClel-

lan had gone to Detroit, plaintiff, who had arranged with the manager of a local bank to wait for him after the closing hour, caused the following letter to be written:

> "THE TRADERS' BANK OF CANADA,
> "WINDSOR, ONTARIO,
> "23d May, 1908.
>
> "THE CASHIER,
> "MERCHANTS' NATIONAL BANK,
> "Muncie, Ind.
>
> "*Dear Sir:*
> "Inclosed please find three drafts amounting to $10,000 with exchange on Messrs. Ball Bros., of your city. On payment of these please deliver inclosed documents to Ball Bros., and issue New York drafts as follows: Frank O'Neill, $5,000, 61900; Marion O'Neill (his wife), Zanesville, O., $2,500, 61901; D. A. Gordon, Wallaceburg, Ont., $2,500, 61902. Kindly mail these direct. The exchange paid by Ball Bros. will pay for cost of the New York drafts issued by you. No protest.
> "Yours truly,
> [Signed]          "GEO. MAIR,
> "Manager.
> "Mrs. O'Neill's address is 775 Market St., Zanesville."

The "documents" referred to in this letter were retransfers to Ball Bros. of the license in question. The contract follows:

"This indenture, made this 15th day of May, 1908, by and between Ball Brothers Glass Manufacturing Company, party of the first part, a corporation organized under the laws of the State of Indiana, and Frank O'Neill, Marion O'Neill, of Zanesville, Ohio, and David A. Gordon, of Wallaceburg, Ontario, Canada, parties of the second part, witnesseth:

"That whereas, on the 25th day of June, 1903, the party of the first part entered into a memorandum of agreement with the parties of the second part by the terms of which the party of the first part granted to the parties of the second part a license in and to United States letters patent, which memorandum of agreement is in the words and figures as follows, to wit:

"'Memorandum of agreement, made this 25th day of June, 1903, by and between Ball Brothers Glass Manufacturing Company, party

of the first part, a corporation organized under the laws of the State of Indiana, and Frank O'Neill and Marion O'Neill, of Detroit, Michigan, and David A. Gordon, of Wallaceburg, Ontario, parties of the second part. Whereas, parties of the second part desire to obtain certain right to said inventions and patents: Now, therefore, it is agreed by and between the parties hereto as follows: In consideration of the payment of one dollar and other valuable considerations, receipt of which is hereby acknowledged, party of the first part grants unto parties of the second part, and their successors or assigns, with the right to grant sublicenses or shop rights, or to sell or assign said license to others, at their discretion, a license for the full terms of said patents respectively to manufacture, use and sell the said letters patent and inventions for the manufacture of all kinds of glassware, except fruit jars, such kinds as are sold to dealers to be distributed for domestic use, liners for fruit jar caps, fruit jar lids, or other parts pertaining to fruit jars: Provided, however, that the license hereby granted, and the sublicenses or other rights hereby authorized, shall not extend to or be exercised within the State of Indiana, or within the territory granted to the Cumberland Glass Co. And, provided further, that said letters patent No. 643,253, and the inventions covered thereby, shall not be used except on machines covered by said patents Nos. 605,648, 616,251, or other patents issued to said Frank O'Neill. It being expressly understood that the license and right hereby granted does not include the right to sell machines in the territory covered herein, for use in Indiana, nor the right to use said invention in Indiana. It is further agreed by the said first party that it nor its successors nor assigns will sell or offer for sale machines or parts of machines covered by the patents herein, in direct competition with the said second parties in the territory licensed herein.

"'In witness whereof, said Ball Brothers Glass Manufacturing Company has signed its corporate name and affixed its corporate seal hereto by its president, attested by its secretary, and parties of the second part have hereunto set their hands and seals this 25th day of June, 1903.

"' BALL BROTHERS GLASS MANUFACTURING COMPANY,

"' By FRANK C. BALL, president.

" ' Attest:

"' WILLIAM C. BALL, Secretary.

"' [BALL BROS. GLASS MANUFACTURING COMPANY. (Seal—1899) Muncie, Ind.]

" ' FRANK O'NEILL.

" ' MARION O'NEILL.

" ' D. A. GORDON.'

" And whereas, the parties of the second part are de-

sirous of reconveying all the right, title and interest which they and each of them were granted by reason of said memorandum of agreement by the party of the first part; and

" Whereas, the party of the first part is desirous of purchasing the right and license granted by reason of the said memorandum of agreement of said second parties:

" Now, therefore, for and in consideration of the payment of $1.00 and other good and valuable considerations paid by the party of the first part to the parties of the second part, receipt of which is hereby acknowledged, the said Frank O'Neill, Marion O'Neill and David A. Gordon, hereby sell, grant and convey and reconvey unto Ball Brothers Glass Manufacuring Company, their successors or assigns, all the right, title and interest which they or either of them received and now hold by reason of said memorandum of agreement herein set forth in full, and they sell and convey for said consideration said license so granted to them. It is understood by and between the parties hereto, and this grant is made for the purpose of and said consideration is paid by the first party to second parties for the purpose of reconveying all the rights which said second parties were granted by said first party by said memorandum of agreement, made the 25th day of June, 1903.

" In witness whereof, the said Frank O'Neill, Marion O'Neill and D. A. Gordon have hereunto set their hands and seals this 15th day of May, 1908.

" MARION O'NEILL.
" FRANK O'NEILL.
" D. A. GORDON.

" Signed in presence of
" P. H. TARMEHILL.
" H. W. KUNTZ.

" THE STATE OF OHIO, } ss. :
" MUSKINGUM COUNTY. }

" Be it remembered, that on this 15th day of May, 1908, before me, the subscriber, a notary public in and for said county, personally came the above named Marion O'Neill and Frank O'Neill, the parties executing the above named instrument, and acknowledged the signing of the same to be their voluntary act and deed, for the uses and purposes therein mentioned.

" In testimony whereof, I have hereunto subscribed my

name and affixed my official seal, on the day and year last aforesaid.

                        "P. H. Tarmehill,
                            "Notary Public.   [L. S.]

"Province of Ontario, County of Essex.

"Be it remembered, that on this 23d day of May, 1908, before me, the subscriber, a notary public in and for the province of Ontario, personally came David A. Gordon, one of the parties executing the annexed instrument, and acknowledged the signing of the same to be his voluntary act and deed for the uses and purposes therein mentioned.

"In testimony whereof, I have hereunto subscribed my name and affixed my official seal on the day and year last aforesaid.

                        "A. H. Clarke,
    "Notary Public, for the Province of Ontario.   [L. S.]

Plaintiff, on his way from Windsor to Wallaceburg, upon thinking the matter over, became convinced that he was entitled to and should have demanded $5,000 of the $10,000 instead of $2,500. He immediately communicated with Frank O'Neill by telephone but did not stop the delivery of the assignment to Ball Bros. or recall the drafts. He demanded from defendant Frank O'Neill the payment of $2,500. This was refused by O'Neill and this suit followed. The declaration is in assumpsit, and the following bill of particulars was furnished:

"To the sum of $2,500 paid by plaintiff to the said defendants by mistake, together with interest thereon from May 30, 1908, or thereabouts, total, $3,000."

Plaintiff recovered a judgment for $2,873.27 against defendants.

It seems to be the contention of the plaintiff that the earlier patents A, B, and C were "pressing and blowing patents," as distinguished from "pressing" patents, which were by the agreement of September 30, 1899, reserved exclusively to Frank O'Neill, and therefore that they are subject to the terms of section 6 of the contract which provides for an equal division between plaintiff and Frank O'Neill of all profits arising from the joint operation of all

patents in which they might become jointly interested. We do not find it necessary to determine to which class the patents in question belong, for the reason that another factor in the case is, in our opinion, controlling. At the time the contract of 1899 was entered into, neither plaintiff nor Frank O'Neill had any interest in the title to these patents, and thereafter Frank O'Neill never acquired such an interest. Plaintiff first secured a one-fourth interest from Arducer and later a one-half interest from defendant Marion O'Neill. When, in June, 1903, the sale was made to Ball Bros., plaintiff owned three-fourths and Marion O'Neill one-fourth. It was then for the first time (after 1899) that defendant Frank O'Neill acquired any interest in the patents in question, and this interest was acquired by way of a license which ran from Ball Bros. to the three parties to this suit. Defendant Marion O'Neill was not a party to the agreement of 1899, and no contract relations existed between her and the plaintiff at any time relative to a division of profits or receipts.

It is clear that the entire title to the patents A, B, and C passed to Ball Bros. by the sale in June, 1903. It is equally clear that the license which Ball Bros. gave back to the parties to this suit created in each of them individual interests. They thereafter had no interest in the title to the patents; nor did they own the license in aliquot parts. Each had an interest separate and distinct from the other, though derived through the same contract, and each had the right to use or sell the same without obligation to the other, in the absence of a contract controlling the matter. *Blackledge* v. *Manufacturing Co.*, 108 Fed. 71, 47 C. C. A. 212; *Lalance & Grosjean Manfg. Co.* v. *Stamping Co.* (C. C.), 108 Fed. 77, and cases there cited.

Defendants' tenth request should have been given. It follows:

"I charge you that the rights of Frank O'Neill and Marion O'Neill and David A. Gordon, under the license agreement with Ball Bros. of date June 25, 1903, were equal, each one having a separate interest, capable of ex-

ercise without the consent and co-operation of the other two, and that neither one was bound to account to the other two for moneys received under the license, in the absence of an agreement with the other two to that effect."

The record nowhere shows an agreement between the parties to divide equally (or in any other proportion) the moneys received under the license; nor does it show the receipt or division of any moneys thereunder during the five years it was in existence.

But passing the question raised by the fact that Marion O'Neill was not a party to any contract with the plaintiff, and assuming that this license related to patents not excepted from the operation of the contract of 1899, there is another and, in our opinion, a more conclusive reason why plaintiff connot recover in this action under the evidence introduced. His suit is planted upon the theory that he paid $2,500 to defendants through a mistake. He does not charge fraud or misrepresentation on the part of either of them, yet the case was submitted to the jury under a charge which plainly raised that issue. The charge is in part as follows:

"Now, gentlemen of the jury, mistakes may be mutual. A mistake may be a mutual mistake (that is, the mistake of both parties), that they did not understand their interests and rights, that they thought that they had three-quarters and one-quarter; or it may be a mistake on the part of the plaintiff caused by some misinformation or lack of knowledge as to what he was entitled to receive. If you find that the plaintiff was misled by any representations that were made to him, or by lack of information which he should have had, or which should have been given to him by the defendant at the time of the transfer, and if you find that he acted under a mistake induced by the acts of the defendant, and that after notice of the fact acted with due diligence, he would be entitled to recover the money which he had paid out under such a mistake."

We have been unable to discover from this record what particular mistake the plaintiff relies upon. He says he has had in mind the 1899 agreement, and that he knew he

was disposing of his interest in the license of 1903. What his interest had been in the patents prior to the sale to Ball Bros. in 1903 seems to us to be immaterial, for, whatever it was, it was obliterated by the sale, and he acquired a new and altogether different interest under the license. The correspondence clearly shows that Ball Bros. were buying and he was selling his interest under the license. Before he finally consummated the transaction, he knew exactly what sum he was to receive for that interest; indeed, he fixed the price himself. He likewise knew the sums which were to be paid by Ball Bros. to Marion O'Neill and Frank O'Neill. The entire transaction was fully set out in the assignment which he executed and acknowledged in the presence of his own legal adviser; and the drafts were drawn by himself; and the letter of instructions accompanying the drafts and the assignment was prepared under his direction.

There was certainly no mistake on the part of either of the defendants. They had fixed the price for their several interests during the negotiations with Ball Bros., and they received that price, no more and no less. Knowing the figure at which his associates were selling, and being fully-advised by the instrument of conveyance as well as by the correspondence exactly as to what was being sold, it is impossible to escape the conclusion that it was his duty to speak before consummating the deal. Had the defendants been advised of his claim before the sale was consummated they would have had an opportunity to protect themselves by declining to proceed until plaintiff's demands had been fully considered and adjusted. Assuming that he had a valid subsisting contract with Frank O'Neill covering this identical license, by the terms of which he was entitled to receive one-half of all the license brought, it is clear that he could agree to change the terms of that contract and accept less than he was entitled to receive. He knew that he was getting less than half; he knew that the O'Neills were getting more than half. Having permitted the sale to go through and the

O'Neills to part with their interests upon the assumption that he was satisfied, with a full knowledge of all the controlling facts, he should now be held to be estopped from claiming any part of the purchase price paid to them. A verdict should have been directed in defendants' favor.

The judgment is reversed, and a new trial ordered.

STEERE, C. J., and MOORE, McALVAY, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.